Bradley John Puetz
d/b/a Desert Tactical
10410 Apples Eye Street
Las Vegas, NV 89131
Tel:(702)625-3822
brad@deserttactical.com
Defendant/Counterclaimant
Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEESPRING, INC. | |
| Plaintiff, | |
| v. | Case No.: 3:15-cv-04149 |
| BRADLEY J. PUETZ, | |
| Defendant | **BRADLEY J. PUETZ'S [PROPOSED] DIRECT EXAMINATION QUESTIONS FOR TRIAL** |
| BRADLEY J. PUETZ d/b/a DESERT TACTICAL | |
| Counterclaimant, | Date:      May 8, 2017 |
| v. | Time:      8:30 a.m. |
| TEESPRING.COM, INC., A Delaware Corporation; DOES I-X; ROE CORPORATIONS I-X, inclusive JONATHAN MAGINNIS, an individual d/b/a ClientMax Marketing; DOES I-X, ROE CORPORATIONS I-X, inclusive | Judge:     Hon. Vince Chhabria |
| | Courtroom: 4, 17th Floor |
| Counterdefendants | |

Defendant / Counterclaims Plaintiff Bradley J. Puetz respectfully submits his proposed questions for his direct examination and testimony.

I. **HISTORY**

1. Introduce yourself.
2. Where do you live?
3. How long have you lived there?
4. Where did you live before that?
5. Is that where you grew up?
6. Did you go to college?
7. What did you study in college?
8. Did you graduate?
9. What did you do for work there?
10. What is your current occupation?
11. Describe what kinds of products does Desert Tactical offers.
12. How long has Desert Tactical been in business?
13. Does Desert Tactical have a website?
14. Do you do graphic design work?
15. Is that graphic design work part of Desert Tactical or a separate business?
16. How long have you been doing graphic design?
17. Have you ever been employed as a graphic designer?
18. Did you go to school to become a graphic designer?
19. Describe some of the designs you've created.
20. Do you primarily focus your design work on military and law enforcement themes?
21. Do you create your designs primarily for use on t-shirts?
22. How long have you been designing t-shirts?
23. Approximately how many t-shirts have you designed over the years?
24. Approximately how many t-shirt designs, that you created, do you sell currently?

II. **CREATION OF THE DESERT TACTICAL DESIGN**

1. What is shown in Exhibit 201?
2. Did you create the work identified as "I'm the Infidel Allah Warned You About"?
   a) Hereinafter, "I'm the Infidel Allah Warned You About" will be referred to as the Desert Tactical Design"
3. How did you create the Desert Tactical Design?
4. When did you create the Desert Tactical Design?
5. How did you come up with the concept for the Desert Tactical Design?
6. When you created the Desert Tactical Design, did it orginally include the phrase "I'm the infidel Allah warned you about"?
7. How did you come up with the concept for the phrase "I'm the infidel Allah warned you about"?
8. Approximately how long did it take you to create the Desert Tactical Design?
9. Did anyone else contribute to the creation of the Desert Tactical Design?
10. How did you intend to use the Desert Tactical Design?
11. What software did you use to create the Desert Tactical Design?
    a) Describe Exhibit 202
12. Did you use any preexisting elements to create the Desert Tactical Design?
13. What preexisting elements did you use?
    a) Are you the original creator of the skull element?
    b) Did you use the whole skull?
    c) What portions of the skull did you specifically use?
    d) How did you modify those portions specifically for use in the Desert Tactical Design
    e) Is the skull in the Desert Tactical Design the same as it previously existed?
    f) Was the skull depicted in the Desert Tactical Design created specifically for use in the Desert Tactical Design?

14. Are there any additional preexisting elements you used to create the Desert Tactical Design?
    a) Are you the original creator of the Arabic script depicted in the "100 Meters" design?
    b) Does the Arabic word "kafir", meaning "infidel", appear in the 100 Meters design?
    c) How did you create the word "kafir" from the 100 Meters design?
    d) What letters making up the word "kafir" appear in the 100 Meters design?
    e) What modifications to those letters did you make for use in the Desert Tactical Design?
    f) Did you create the Arabic word "kafir" as depicted in the Desert Tactical Design specifically for use in the Desert Tactical Design?
15. Are there any other preexsisting elements you used to create the Desert Tactical Design?
    a) Where did you obtain the image of the American flag?
    b) Did you modify the image of the American Flag image?
    c) How did you modify the original image of the American flag?
    d) Does the image of the American flag appear the same in the Desert Tactical Design as it does in the original image?
    e) Was the modified portion of the American flag image used in the Desert Tactical Design specifically created for use in that design?
16. Why did you use some preexisting portions of designs you previously created?
17. How did you intend to use the Desert Tactical Design you created?
    a) Did you have the Desert Tactical Design printed on t-shirts?
    b) Have you used the Desert Tactical Design as part of the Desert Tactical website?

III.   **DESERT TACTICAL COPYRIGHT**

1. Did you file for a copyright for the Desert Tactical Design?

       a) When did you file for the copyright?

       b) How did you file for the copyright?

       c) Were you issued any kind of receipt of filing by the Copyright Office at the time you filed?

           i. What was the pre-registration number you were issued?

   2. Did you eventually receive a copyright certificate from the U.S. Copyright Office?

       a) Describe Exhibit 200.

       b) When did you receive your registration certificate from the Copyright Office?

       c) What is the registration number issued for the Desert Tactical Design?

       d) What is the effective date of the copyright registration?

       e) Do you have any reason to believe the certificate is not valid?

   3. What type of work did you claim the Desert Tactical Design was on the copyright registration application?

       a) Why didn't you register the Desert Tactical Design as a compilation?

   4. What type of work did the Copyright Office register the Desert Tactical Design as?

   5. Did the copyright certificate include any addendum from the Copyright Office limiting the registration?

   6. Did the Copyright Office exclude any element of the Desert Tactical Design?

   7. Did the Copyright Office refuse to register any specific, individual element of the Desert Tactical Design?

   8. Did the Copyright Office deny the registration of the Desert Tactical Design in any way?

**IV.**    **FIRST USE**

   1. When did you first use the Desert Tactical Design?

       a) Have you ever used the Desert Tactical Design without the "I'm the infidel Allah warned you about" phrase?

       b) Do you recall when you used it without the phrase?

           i. Do you recall how you used it without the phrase?

      c) How did you first use the Desert Tactical Design with the phrase?

          i. Do you recall when that use first occurred?

      d) How else have you used the Desert Tactical Design?

2. When did you first have the Desert Tactical Design printed on t-shirts?

3. When did you begin selling t-shirts with the Desert Tactical Design on them?

      a) Do you sell them online?

          i. Where do you sell them online?

          ii. When did you begin selling them on the Desert Tactical website?

      b) Do you sell them elsewhere?

          i. Where else do you sell them?

          ii. When did you begin selling them at gun shows?

          iii. What was the location of the first gun show you offered them for sale at?

          iv. Out of all the gun shows you attend, which one would be considered your busiest?

4. Do you currently sell t-shirts printed with the Desert Tactical Design?

5. Have you ever licensed anyone to use the Desert Tactical Design?

6. Have you ever given anyone permission to use the Desert Tactical Design?

**V.    COMPARISION OF THE DESERT TACTICAL DESIGN AND THE MAGINNIS DESIGN.**

1. In your own words, describe the Desert Tactical Design.

      a) Describe the skull element of the design.

      b) Describe the bandana and it's placement.

      c) Describe the word "infidel" and its placement on the skull.

      d) Describe the phrase "I'm the infidel Allah warned you about".

      e) Describe the placement and arrangement of all the elements in the Desert Tactical Design.

      f) Describe the overall feel of the Desert Tactical Design.

      g) Describe the expression of the Desert Tactical Design.

2. In your own words, describe the Maginnis Design.
    a) Describe the skull element of the Maginnis Design.
    b) Describe the bandana and its placement.
    c) Describe the word "infidel" and its placement on the skull.
    d) Describe the phrase "I'm the infidel Allah warned you about".
    e) Describe the placement and arrangement of all the elements in the Maginnis Design.
    f) Describe the overall feel of the Maginnis Design.
    g) Describe the expression of the Maginnis Design.
3. Describe any similar expressions between the Maginnis Design and the Desert Tactical Design.
    a) Describe the expression of the skull in the Maginnis Design compared to the Desert Tactical Design.
    b) Describe the expression of the bandana on the skull in the Maginnis Design compared to the Desert Tactical Design.
    c) Describe the Arabic script, and its expression in the Maginnis Design compared to the Desert Tactical Design.
    d) Describe the expression of the phrase "I'm the infidel Allah warned you about" on the Maginnis Design compared to the Desert Tactical Design.
4. Does the Maginnis Design incorporate any unique elements or features that are not found in the Desert Tactical Design?
5. Does the Maginnis Design remove or omit any of the elements of the Desert Tactical Design?
6. Does the Desert Tactical Design contain any unique elements that are not found in the Maginnis Design?
7. Is it your opinion the Maginnis Design is an identical copy of the Desert Tactical Design?
    a) What are your reasons for this opinion?

**VI.     ACCESS TO THE DESERT TACTICAL DESIGN**

1. Do you have a Facebook page?
    a) Approximately how many Facebook friends do you have?
2. Does Desert Tactical have a fan page?
    a) Approximately how many fans does Desert Tactical have?
3. Does US Infidels have a Facebook fan page?
    a) To your knowledge, approximately how many fans does US Infidels have?
    b) Do you have any common friends with US Infidels?
        i. How many common friends do you and US Infidels share?
        ii. Can you access the US Infidels list of fans?
        iii. Why not?
4. How do you contend Mr. Maginnis may have had access to the Desert Tactical Design?
    a) Do you have direct evidence of this purported access to the Desert Tactical Design?
    b) Can you prove Mr. Maginnis has deleted or otherwise removed content from the US Infidels fan page?
    c) What evidence do you have to support your claims that content has been removed from the US Infidels website?
    d) Do you have evidence that any of the deleted content may have been significantly relevant to this litigation?
5. Have you ever posted pictures of the Desert Tactical Design on any form of social media prior to June 1, 2015?
    a) When did you first post a picture of the Desert Tactical Design on Twitter?
    b) Did it get retweeted?
    c) How many times was the photograph retweeted?
    d) How many combined followers do the people have that retweeted the photograph?

6. Are people attending the gun shows permitted to take pictures of your t-shirt designs?
   a) Have you ever witnessed any of them taking pictures of the Desert Tactical Design without your permission?
   b) Can you estimate how many pictures are taken of the Desert Tactical Design without permission during an average two-day gun show?
   c) In your opinion, do you think some of these pictures are subsequently posted on social media sites?
7. Approximately how many total shirts bearing the Desert Tactical Design do you estimate you sold between February, 2015 and June 1, 2105?
   a) Can you estimate the percentage of online shirt sales versus gun show shirt sales of the Desert Tactical Design?
8. Is it your opinion that Mr. Maginnis somehow encountered the Desert Tactical Design through sales of t-shirts bearing the Desert Tactical Design?
9. Is it your opinion that Mr. Maginnis likely encoutered a social media post of the Desert Tactical Design?

VII. **HOW TEESPRING WORKS**

1. Have you ever been on the teespring.com website?
2. For what purpose did you visit the Teespring website?
3. Describe Exhibit 203.
4. Describe how you initiated a campaign on Teespring.
   a) Did you upload a design to Teespring.com?
      i. How did you upload the design?
      ii. Was there any text displayed on or around the upload button?
      iii. Did you read that notice before you uploaded your design?
      iv. Do you have to click that button to upload your design?
   b) Did you set the price of the t-shirt you wanted to sell?
   c) Did Teespring tell you how much money they would take from each shirt sold?

      d) What was your potential profit from each t-shirt sold?

5. What other campaign parameters does Teespring allow you to set?

      a) Did you set the number of days the campaign should run?

6. Did you actually launch the campaign on teespring.com?

      a) What happens when you launch the campaign?

7. Did you notice any links regarding copyright and trademark laws?

8. Did you notice any warnings regarding uploading copyright infringing artwork?

9. From June 1, 2015 until today, how many times would you say you've visited teespring.com?

10. For what purpose?

11. What did you find?

12. Did you take action?

13. How many times has this occured since June 1, 2015 until today?

14. What did Teespring do after you notified them?

      a) How long did it take them to remove the campaigns?

      b) Did Teespring remove any of those campaigns before you notified them?

      c) In your opinion, did Teespring continue to fail to police its website for similar versions of the Maginnis Design?

15. When was the most recent instance you found the Maginnis Design for sale on Teespring?

      a) Was that campaign live?

16. Were there any other instances of the Maginnis Design being offered for sale on Teespring?

      a) Was that campaign live?

17. And the time before that?

      a) Was that campaign live?

18. Were there more instances of the Maginnis Design being offered on Teesping?

      a) Were any of those campaigns live?

19. Is it correct then, that you've discovered no less than 3 live campaigns on Teespring since the onset of this litigation?

VIII.  THE "LAST CHANCE TO ORDER" CAMPAIGN ON TEESPRING

1. How did you first become aware of the Maginnis Design?
   a) When was that?
2. Is Exhibit 204 the Facebook ad you saw?
   a) Can you describe the Facebook ad?
   b) Did you click on the link in the Facebook ad?
   c) What happened when you clicked that link?
   d) Was the Maginnis Design being offered for sale on teespring.com?
      i. Do you recall what the price for a t-shirt with the Maginnis Design was being sold for?
      ii. Did you know how many t-shirts bearing the Maginnis Design had been sold as of June 6, 2015?
      iii. How did you ascertain the quantity of shirts sold by Teespring as of the June 6th, 2015 date?
      iv. Did you demand money or damages from Teespring in June of 2015?
3. Had you ever heard of Teespring prior to clicking on the Facebook ad?
4. Had you ever heard of US Infidels prior to encountering the Maginnis Design on Facebook?
5. What was your reaction to the US Infidels Facebook ad offering t-shirts for sale with the Maginnis Design?
   a) What happened after that?
6. Did you contact Teespring?
   a) When did you contact Teespring?
   b) How did you contact them?
   c) What did you email to Teespring?

      d) Is the cease and desist you sent depicted in Exhibit 205?

      e) What was Teespring's response?

          i. Are Exhibits 206 and 207 the emails you received?

      f) Did Teespring remove the Maginnis Design to investigate your claims of copyright infringement?

7. Did you contact Mr. Maginnis at that time as well?

8. Did you contact Teespring on more than one occasion?

      a) How did you contact them this time?

      b) What did you say in your email?

      c) Describe Exhibit 208

          i. Describe Exhibit 20 please.

          ii. Was Exhibit 20 attached to your email?

          iii. Describe Exhibit 209 please.

          iv. Describe Exhibit 210 please.

          v. Describe Exhibit 211 please.

          vi. Describe Exhibit 212 please.

          vii. Describe Exhibit 213 please.

      d) Did Teespring suspend sales of the Maginnis Design after you contacted them?

9. Please describe Exhibit 214.

10. What was Teespring's response?

      a) Is that letter identified as Exhibit 52?

11. What was your reply to Mr. Carroll's letter?

12. Is the email in Exhibit 221 your response to Mr. Carroll?

      a) Can you read the email please?

13. What was Mr. Carroll's reply?

14. Did Teespring email you at any time after you received the letter from Mr. Carroll?

15. How did you feel about a lawyer contacting you on behalf of Teespring?

16. What other emails did you send to Teespring and Mr. Carroll?

    a) Did you receive any replies to those emails?

    b) Did some of those emails contain profane and/or abusive language?

    c) Did you receive a reply to any of those emails?

    d) Do you feel those emails were inappropriate and unprofessional?

    e) Why did you feel it was necessary to send emails to Teespring and Mr. Carroll with inappropriate content?

    f) What would you do differently now versus then?

    g) Do you feel that those emails helped to resolve the situation?

17. Did you continue to see Facebook ads for the Maginnis Design?

18. Can you confirm Exhibit 223 is a Facebbok ad dated July 27, 2015?

    a) Did you click on this ad?

    b) Do you recall how many t-shirts from the Last Chance to Order campaign Teespring had sold at this point?

    c) What did you do after that?

    d) What did you email them on this occasion?

    e) To whom did you email it to?

    f) Did you receive a reply?

19. To the best of your knowledge, did Teespring ever suspend sales of the Maginnis Design from Teespring?

    a) How did you come to that conclusion?

20. Please describe the photograph in Exhibit 230.

21. You testified earlier that you received your copyright certificate on August 31, 2015, is that correct?

    a) What did you do when you received it?

22. Please describe the email in Exhibit 226.

    a) Please identify Exhibit 227.

    b) Was Exhibit 227 attached to the email in Exhibit 226?

    c) Did Teespring reply to the email?

23. Describe the email in Exhibit 231 please.
   a) Did Mr. Carroll reply?
      i. What was Mr. Carroll's reply?
24. Please describe Exhibit 228.
25. Please describe Exhibit 229.
26. Did Teespring take action after receiving your copyright certificate?
   a) To your knowledge, when did they terminate the Maginnis Design campaign?
   b) By terminating the Maginnis Design campaign, did Teespring demonstrate and exersise control over the content on teespring.com.
   c) In your opinion, did Teespring have this right and ability to exercise this control at any time?
27. Did you have any further contact with Teespring or Mr. Carroll?

IX. **THE LITIGATION**
1. Did you ever threaten to file a lawsuit against Teespring?
   a) When did you do so?
   b) Why did you threaten Teespring with bringing forth a lawsuit?
2. Why are you the defendant in this litigation and not the plaintiff?
3. Do you recall how you became aware the Teespring had filed suit against you?
   a) When did you become aware of the lawsuit?
4. Describe your reaction when you found out Teespring filed suit against you.
5. Did you contact Teespring once you became aware of the lawsuit?
   a) How did you contact Teespring?
   b) What was Mr. Carroll's response?
   c) Did you ever attempt to settle the lawsuit?
   d) What was the result of that settlement discussion?
6. What did you do next?
   a) What was Teespring's response to your counter-suit?

7. How did you discover that Mr. Maginnis was responsible for uploading the Maginnis Design to teespring.com?
8. Was Mr. Maginnis a party in this litigation from the onset?
9. How did Mr. Maginnis become a party to the lawsuit?
   a) When did Mr. Maginnis become a counter-claims defendant in this litigation?
   b) Why did you feel it was necessary to enjoin Mr. Maginnis to this lawsuit?
10. Has Mr. Maginnis filed counter-claims against you for any damages?
11. Has Teespring filed any claims against Mr. Maginnis?
12. Has Mr. Maginnis filed any claims against Teespring?

X. **DAMAGES**

1. Are you seeking damages as part of your counter-claims?
2. What damages are you seeking against Teespring?
   a) Please describe Exhibit 285.
   b) Can you identify each of the itemized categories in Exhibit 285?
      i. Can you identify the total dollar amount of the "total sales" category?
      ii. Can you identify the total dollar amount in category labeled "remaining amount"?
         - Does this amount appear to be Teespring's profit?
   c) Does Exhibit 285 identify costs and expenses associated with the Last Chance to Order campaign?
3. Please describe the Exhibit 287 beginning on page 7, line 11.
   a) Do the deductions match the deductions in Exhibit 285?
   b) Does Exhibit 287 corroborate the profit amount Teespring disclosed in Exhibit 285?
4. What damages are you seeking against Mr. Maginnis?
   a) Please describe Exhibit 286.
   b) Does Exhibit 286 identify Mr. Maginnis' profits attributable to the Last Chance to Order campaign?

      c) Who disclosed the documents marked Exhibit 286?

          i. What was the profit amount Mr. Maginnis disclosed contained in Exhibit 286?

      d) Does that amount match Teesprings "payout amount" category in Exhibit 285 and Exhibit 287?

          i. What amount did Mr. Maginnis disclose?

          ii. What amount did Teespring disclose?

5. Do you feel that Teespring would be liable because their profits were less than Mr. Maginnis?

6. Do you feel that Mr. Maginnis would have more liability because he profited more than Teespring?

7. Are you seeking any other damages?

8. What did you do to mitigate your damages?

## XI. CONCLUSION

Mr. Puetz reserves the right to modify these questions as necessary during trial. Mr. Puetz may need to amend, supplement, or omit certain questions based on the prior testimony of Mr. Puetz, as well as other witnesses in the case.

DATED: May 1, 2017                                                          Respectfully submitted,

/s/ Bradley J. Puetz  
Bradley J. Puetz  
Desert Tactical  
10410 Apples Eye St.  
Las Vegas, NV 89131  
(702) 701-2878  
Brad@deserttactical.com  
Defendant Pro Se